IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Gerling & Associates, Inc., | : | |
| Plaintiff | : | Case No. 2:10-cv-1074 |
| v. | : | |
| Gearhouse Broadcast Pty Ltd., | : | Magistrate Judge Abel |
| Defendant | : | |

**ORDER**

This lawsuit arises out of a contract for plaintiff/counterclaim defendant Gerling & Associates, Inc. to sell a rack-ready television production trailer to defendant/counterclaim plaintiff Gearhouse Broadcast Pty Ltd. Gerling filed this lawsuit seeking a declaratory judgment that Gearhouse accepted the trailer and subsequently voided the warranty. Gearhouse filed a counterclaim seeking damages for Gerling's alleged breach of that contract, breach of implied and express warranties, and for unjust enrichment based on its claims that the trailer did not meet contract specifications for maximum width and 72,000 BTU air conditioning units. To avoid the clumsy use of plaintiff/counterclaim defendant and defendant/ counterclaim plaintiff, this Order will refer to the parties as Gerling and Gearhouse.

The following motions *in limine* are pending before the Court.

<u>Motion in Limine to Preclude any Expert Testimony by Defendant and to Preclude the Use of Mr. Humphrey's Trial Deposition (Doc. 103)</u>. Gerling seeks an order

precluding Gearhouse from introducing any expert witness testimony on the basis that Gearhouse failed to make the required expert disclosures under Rule 26(a)(2) of the Federal Rules of Civil Procedure. The parties were required to exchange primary expert disclosures and reports by December 14, 2011 and to exchange rebuttal expert reports by January 16, 2012. Because Gearhouse failed to submit any expert disclosures, it should be precluded from offering any expert opinion testimony on any matter, including any issues related to contract interpretation, the necessity for repairs, any repairs made to the trailer, the New South Wales registration requirements, and whether the trailer complied with those alleged requirements. Gerling also seeks to preclude the use of Humphrey's trial deposition because he had previously been identified solely as a fact witness yet expresses expert opinions. Humphrey identifies himself as a professional mechanical engineer and provides an interpretation of the Australian road requirements. In his testimony regarding the inspection of the trailer upon its arrival in Australia, Humphrey seeks to apply the measurements he purports to have taken to what he says are the Australian rule requirements. Gerling maintains that Humphrey's proposed testimony should be precluded under Rule 701 of the Federal Rules of Evidence, which provides, "[i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences . . . not based on scientific technical or other specialized knowledge within the scope of Rule 702."

In response, Gearhouse argues that Humphrey is not an expert witness. He is a fact witness who will testify to observations regarding the trailer, his inspection of the trailer following its delivery to Australia, and his communications with Gearhouse and Gerling throughout the construction process. According to Gearhouse, Humphrey is a compliance engineer who was engaged to assist the parties in meeting the requirements of Australia's Roads and Transit Authority ("RTA"). Humphrey communicated with Fred Gerling directly on several occasions regarding the RTA's regulations and the means of achieving compliance. When the trailer arrived in Australia, Humphrey measured the trailer and confirmed that it was overwidth. Humphrey generated a report detailing the items of non-compliance and provided that report to Gearhouse. Gearhouse gave the report to Gerling.

Gearhouse maintains that it communicated its intent to have Humphrey testify as a fact witness and does not intend to call him as anything other than a fact witness. Gearhouse maintains that an eyewitness, regardless of profession or experience, may testify as to the size, weight and distance of an object among other measurable aspects. Gerling has previously testified that he was fully aware of what the road regulations required and that he would build a trailer that would conform to such requirements. As a result, Humphrey can testify about what the parties agreed to, his communication with the parties about the requirements, and his measurement based upon his personal inspection of the trailer.

Decision. A private company cannot import a large trailer into Australia on its own. "It has to be imported through the auspices of an approved agent . . . nominated by the company importing the vehicle." (Fischer Dep., 13-14.) Gearhouse chose Kevin Humphrey as its approved agent. (*Id.*, 14.) Once the vehicle arrives in Australia, it has to be approved by a Regional Transportation Authority-approved inspector nominated by the importer. Gearhouse selected Humphrey for that task as well. (*Id.*, 14.) Humphrey, a mechanical engineer, worked as a consultant who obtained "the certification of vehicles that had been modified and also obtain[ed] design approval for imported vehicles and one-off type vehicles." (Humphrey Dep., 5-6, 56.) Humphrey testified that Gearhouse hired him "to obtain compliance approval on the trailer they wished to import from the United States." (*Id.*, 6.) He further testified that when a heavy trailer is imported, you have to obtain design approval from the federal government in Canberra. Once that is obtained, a compliance plate, showing that the vehicle meets the design rules, is affixed to the vehicle, and the state registration authorities register it. (Id., 6-7, 11.) To accomplish the registration, Humphrey had to "register with the Department of Transportation, Regional Services in Canberra to become their [Gearhouse's] . . . consultant for that particular vehicle." (*Id.*, 10.) Humphrey had to certify that the vehicle met the Australian Design Rules ("ADRs") before the governmental authority would issue a compliance plate. (*Id.,* 11.)

The vehicle was to be registered in New South Wales. The ADRs state that the maximum width of vehicles, excluding lamps, mirrors, and signaling equipment, is

4

2500 mm. ADR 44-04. (*Id.*, 9, 13, 24.) If that width is exceeded, it was possible to get a permit that restricted road travel to non-peak hours. (*Id.*, 14.)

Humphrey testified that he measured the width of the trailer in the rear at 2505 mm. Further, when a gutter over a slide-out section, ladder brackets at the front side door, and seals over the covers over the slide-out locking porch were added to the width, Humphrey had the "impression" that the overall width was about 2550 mm. (*Id.*, 19.) Humphrey testified that he would have had to submit those actual widths to the Regional Transportation Authority, had he applied for a certificate of compliance. (*Id.*, 21.)

When Humphrey performed a second inspection after Varley made modifications, the width met the ADR requirement that it not exceed 2500 mm. (*Id.*, 21, 27, 29.) He applied for certification, and a certificate of compliance was issued and the vehicle was registered. (*Id.*, 29-30.)

Here, Humphrey was retained based on his expertise as a compliance engineer and approved agent to assist Gearhouse in meeting the requirements of the regulations governing the licensing of the trailer. Humphrey testified on deposition about his findings from examining the trailer and his assessment of whether it would satisfy the requirements of the Australian national and state regulations. Based on his inspection, he determined that the trailer exceeded the width requirements and could not be licensed at that time. Although his inspection was based on his expertise and experience as an engineer, he testified about the facts, *i.e.*, he measured the trailer and determined

5

it was too wide to comply with the regulations. Additionally, he testified about his communications with Gerling regarding the ADRs. I conclude that Humphrey may testify as a fact witness concerning his examination of the trailer, the modifications he found should be made before the trailer could be registered, his observations of the trailer at Varley, his understanding of the New South Wales registration requirements, and whether the trailer complied with those requirements.

To the extent that Humphrey expresses opinions that may purport to be based on his expertise, those opinions were contained in his report to Gearhouse that Gearhouse transmitted to Gerling. Thus, Gerling has been aware since the inception of this lawsuit of the opinions Humphrey would testify to. Because I find that the Humphrey's testimony is that of a fact witness, Gerling's motion *in limine* to preclude any expert testimony by Gearhouse and to preclude the use of Humphrey's trial deposition (Doc. 103) is DENIED.

<u>Motion in Limine to Preclude Evidence or Argument that Defendant has Sustained Repair Damages or has Sustained Lost Profits or Lost Opportunities as a Result of Any Alleged Deficiencies (Doc. 104)</u>. Gerling argues that Gearhouse rests it claim for repair damages on inadmissible documents. Although Gearhouse alleges that Varley Group ("Varley") made repairs to the trailer, there are no documents evidencing payments from Gearhouse to Varley for any alleged repairs. Moreover, Gearhouse admits there are no such payments. Gearhouse bases its entire damages claim on a

6

collection of proposals and invoices from Varley to Sony Australia and one nondescript invoice from Sony Australia to Gearhouse. The Sony invoice does not comport with either the Varley invoices or the amount of work that would have been required to fix the alleged issues with the trailer.

For Gearhouse to introduce the Sony and Varley documents, testimony of representatives from Sony Australia or Varley would be necessary. The Court, however, has already determined that Gearhouse may not call a representative from Sony Australia or Varley as a trial witness. Gerling argues that the Gearhouse has attempted to circumvent the Court's prior holding with its February 20, 2013 disclosure of witnesses.

Gerling argues that Gearhouse also cannot rely on its own representatives to lay the foundation necessary to admit the documents as business records under Rule 803(6) of the Federal Rules of Evidence.

Gerling also argues that Gearhouse should be precluded from presenting evidence or argument concerning its lost profits or lost opportunities because there were no documents produced evidencing such damages. Gearhouse failed to disclose any contracts to which it was a party that could have in any way been impacted by the trailer. Gerling maintains that any information from other sources as to lost opportunities would be inadmissible hearsay insufficient as a matter of law to support the claim for lost profits. Gerling further argues that the existence and the amount of lost profits must be demonstrated with reasonable certainty which can be established

7

with the aid of expert testimony, economic and financial data, market surveys and analyses, and business records of similar enterprises. Gearhouse, however, has failed to identify an expert witness or any business records to support its claim for lost profits.

Gearhouse maintains that it is not claiming damages for lost profits or opportunities. Gearhouse seeks damages for the cost of the repairs that it performed in order for the trailer to conform to contract specifications and amounts spent to obtain substitute goods in order to meet its obligations to customers. Gerling seeks to exclude the admission of the contract between Premier Media Group and zer01zer0 HD Pty Limited ("Premier/zer0 Agreement") on the basis that there is no mention whatsoever of any right or obligation of Gearhouse. Gerling was provided a copy of the agreement prior to the depositions of representatives of Gearhouse and had ample opportunity to inquire as to the identities of the parties to the agreement and their relationship to Gearhouse.

In response to the Court's request that Gearhouse describe the evidence it intends to introduce regarding damages, Gearhouse filed a supplemental brief and documents concerning its damages. Gearhouse maintains that all of its documents relating to its damages were provided to Gerling during discovery. Gearhouse further maintains that Gerling previously stipulated to the authenticity of the documents related to damages, and this stipulation was memorialized in the earlier filed Joint Final Pretrial Order. *See* doc. 75. Gearhouse maintains that by entering into the stipulation, Gerling waived any right to challenge the authenticity of the documents. Gearhouse

maintains that challenging the authenticity of the documents so close to trial is profoundly unfair and prejudicial to Gearhouse. Had Gearhouse been made aware of the challenges in a timely manner, Gearhouse would have had time to obtain foreign affidavits as contemplated by Rule 902(12). If affidavits are necessary, Gearhouse requests additional time to obtain such affidavits.

<u>Decision</u>. John Newton, a managing director of Gravity Media Group, a UK corporation that is the parent company and 100% owner of Gearhouse, testified that Sony picked and contracted with Varley to modify the trailer. (Newton Dep., 15-16, 30, 50.) Varley didn't invoice Gearhouse for work on the trailer, and Gravity Media didn't pay Varley for the work. (*Id.*, 18.) Newton didn't know how Varley billed Sony. (*Id.*, 50.) Sony started putting electronics in the trailer after Varley completed its work. (*Id.*, 23.)

Although Gearhouse has proffered documents that it maintains are evidence of the damages it has sustained and Gerling has argued that those documents are inadmissable and fail to prove those damages, the Court is not in a position to rule on the admissibility of many of those documents without having an opportunity to hear the testimony Gearhouse maintains will demonstrate that they are business records kept in the ordinary course of business that reflect the damages it incurred as a direct result of Gerling's alleged breach of contract. For example, a repair estimate alone is not sufficient evidence to prove damages, but it may be evidence of damages suffered when offered with other competent evidence. *See, Air Caledonie International v. AAR Parts Trading, Inc.*, 315 F.Supp.2d 1319, 1341-43 (S.D. Florida 2004).

Gerling's motion *in limine* to preclude evidence or argument that Gearhouse has sustained repair damages or has sustained lost profits or lost opportunities as a result of any alleged deficiencies (Doc. 104) is DENIED.

At trial, Gearhouse must demonstrate that the documents it relies on to prove damages fall within the business records exception of Fed. R. Evidence 803(6), which provides that a document is not hearsay if it is "[a] record of an act, event, condition, opinion, or diagnosis if:"

> (A) the record was made at or near the time by-or from information transmitted by–someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> (C) making the record was a regular practice of that activity;
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
> (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Gearhouse maintains that "a document prepared by a third party is properly admitted as part of the business entity's records if the business integrated the document into its records and relied upon it." *Air Land Forwarders, Inc. v. U.S.*, 172 F.3d 1338, 1342 (Fed. Cir. 1999). While some or all of the third party documents Gearhouse intends to offer to prove damages may fall within this rule, Gearhouse must demonstrate as to each documents that each of the predicates to admission set out in Rule 803(6) have been satisfied. Rule 803(6) is to be read in light of the purposes it serves:

> The theory behind the business records exception embodied in Rule 803(6) is that "[r]eports and documents prepared in the ordinary course of

> business are generally presumed to be reliable and trustworthy." *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 204–05 (4th Cir.2000). Records of that sort are considered trustworthy because "businesses depend on such records to conduct their own affairs; accordingly, the employees who generate them have a strong motive to be accurate and none to be deceitful" and secondly, because "routine and habitual patterns of creation lend reliability to business records." *Id*. at 205. In determining admissibility courts are to consider "the character of the records and their earmarks of reliability ... from their source and origin and the nature of their compilation." *Palmer v. Hoffman*, 318 U.S. 109, 114, 63 S.Ct. 477, 87 L.Ed. 645 (1943).

*Rambus, Inc. v. Infineon Technologies AG*, 348 F.Supp.2d 698, 702 (E.D. Va. 2004). The courts admitting third party documents as business records of the offering party rely heavily on two factors: (1) that the party keeping the business record relies on the accuracy of the document and (2) other circumstances demonstrate the trustworthiness of the document. *Air Land Forwarders,* 172 F.3d, above, at 1343.

<u>Motion in Limine to Preclude Evidence or Argument that Gerling Breached an Implied Warranty (Doc. 105)</u>. Gerling argues that Gearhouse should be precluded from introducing any evidence or argument regarding any claim that Gearhouse has an implied warranty of merchantability or fitness because Gearhouse's conduct eliminated any such implied warranty. Gerling relies on Ohio Revised Code § 1302.29(C)(2), which provides: "when a buyer before entering into the contract has examined the goods or the sample or model as fully as he desired . . . there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him." Moreover, "a professional buyer examining a product in his field will be held to have

11

assumed the risk as to all defects which a professional in the field ought to observe." Ohio Revised Code § 1302.29, Official Comment 8.

Gearhouse is in the media production business and has purchased television production trailers before. Gearhouse sent its representative to Gerling's facility for a final inspection of the trailer after previously identifying for its representative to focus on Australian compliance issues. Gearhouse's representative spent over two weeks examining the trailer and provided a 74-item punch list of items that were remedied by Gerling. According to Gerling, at no point during the examination of the trailer were the current alleged defects identified by Gearhouse–defects that were readily obvious. Based on this two-week examination prior to accepting the trailer, Gerling argues that implied warranties have been excluded. Fisher, who examined the trailer at Gerling's facility, measured the width of the trailer and concluded it was not in excess of two and half meters.

In response, Gearhouse argues that the examination of the vehicle at Gerling's facility was not a final inspection. At the time of the inspection, the trailer was not complete, and Gearhouse was not able to fully inspect the trailer. Gearhouse argues that because it was only able to preliminarily inspect a partially completed vehicle, the implied warranty claims are not precluded. Gearhouse maintains that it never signed the final acceptance.

Decision. Section 1302.29(C)(2) of the Ohio Revised Code states:

> [W]hen the buyer *before entering into the contract* has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him.

Ohio Rev. Code § 1302.29(C)(2) (Emphasis added).

John Fisher, a freelance engineer who performed work for Gearhouse in connection with its purchase of the trailer from Gerling, testified that he first went to Gerling's plant in Sunbury, Ohio to look at a trailer in stock there. He examined it to determine whether it was suitable for Gearhouse's purposes. Over a period of days, he determined that, with certain modifications, it was. (Fisher Dep., 10-11.) Although aware of the ADRs, he did not measure the trailer for width. (*Id.*, 11.) He did not look at the air conditioning units because they were covered against the weather. (*Id.*, 12.)

Although he knew that the extended completion date for the trailer was June 24, Fisher returned to Sunbury on June 14, 2010 to inspect the trailer. (*Id.*, 16.) He had unrestricted access to the trailer. (*Id.*, 17.) He did not look at the air conditioning units because they were covered against the weather. (*Id.*, 12.) Although he knew that the extended completion date for the trailer was June 24, Fisher returned to Sunbury on June 14, 2010 to inspect the trailer. (*Id.*, 16.) He had unrestricted access to the trailer. (*Id.*, 17.)

Fisher measured the width of the trailer "across the back. It was not in excess of two and a half meters." (*Id.*) He did not measure the trailer at any other point, because to make precise measurements "requires a lot of people, a lot of time, and some very,

13

very careful measurements." (*Id.*, 18-19.) Although he had planned to leave Sunbury on June 25, Fisher extended his visit to June 28, 2010 "because of the delivery date slipping." (*Id.*, 34-35.)

Here, the agreement was signed by Fred Gerling on March 16, 2010 and by Graham Elliot on March 17, 2010. *See* doc. 106-1. The inspection upon which Gerling relies did not occur until June 2010, months after the contract had been signed by the parties. Moreover, the uncontroverted evidence is that the at the time Fisher examined the trailer, it was not fully completed. As a result, Gerling's motion *in limine* to preclude evidence or argument that Gerling breached an implied warranty (doc. 105) is DENIED.

<u>Motion in Limine to Preclude Evidence and Argument related to Defendant's Subjective Understanding of the Parties' Purchase Agreement (Doc. 106)</u>. Gerling asserts that Gearhouse intends to present evidence of its agents' purported understanding of several terms of parties' contract. Gerling argues that Gearhouse has taken the position that the air conditioner portion of the contract means something other than what it explicitly says. That is, Gerling states that Gearhouse maintains that the agreement required Gerling to provide two air conditioners in excess of 72,000 BTU. The unambiguous language of the agreement stated that Gerling was to "Supply and install two (2) 72,000 BTU, three phases operation G-Force 6-Ton Wall mount air conditioning units." Gerling argues that this contractual provision is clear and unambiguous, so evidence of subjective belief as to the contractual terms is irrelevant

14

and must be excluded. *Holznagel v. Charter One, F.S.B.*, 2000 WL 1844780, at *6 (Ohio App. 8th Dist. Dec. 14, 2000)(citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St. 2d 241, 246 (1978).

Gearhouse argues that the contract required Gerling to meet the New South Wales build requirements and certain specifications related to the air conditioning units. Gearhouse maintains that it is permitted to introduce testimony and documents demonstrating that Gerling failed to provide what was required by the contact.

At the final pretrial conference, counsel appeared to agree on the controlling law. That is, the contract terms control. A party's subjective understanding of a contract term that was not communicated to the other contracting party during contract formation is never admissible. Communications regarding the meaning of contract terms during contract formation are admissible if, and only if, the contract term is ambiguous. *Shifrin v. Forest City Enterprises, Inc.*, 64 Ohio St. 3d 635, 638 (1992). Gearhouse maintains that the dispute is whether Gerling provided what was required pursuant to the contract and that to the extent that the contract is ambiguous, it is permitted to introduce parol evidence. Gearhouse indicates it does not intend to introduce evidence related to Gearhouse's "subjective understanding" of the parties' agreement. Gerling's motion *in limine* to preclude evidence and argument related to Gearhouse's subjective understanding of the parties' purchase agreement (doc. 106) is DENIED as premature. Gerling may object to evidence at trial if it concerns Gearhouse's subjective understanding of the agreement.

Motion in Limine to Preclude Evidence or Argument that Defendant Rejected the Trailer or that Gerling Breached the Agreement on Grounds Not Specifically Identified (Doc. 107). Gearhouse intends to take the position that it did not accept the trailer. Gerling argues that based upon the applicable law and undisputed facts, Gearhouse did not seasonably and did not properly reject the trailer in the manner required by the UCC and should not be able to introduce evidence or argument claiming that it has. The UCC spells out two mutually exclusive options for the buyer: reject or accept the good. In order to rightfully reject the goods, the buyer must seasonably notify the seller of the rejection within a reasonable time after their delivery or tender. Gerling maintains that the evidence demonstrates that Gearhouse failed to properly reject the trailer.

Gearhouse accepted physical delivery of the trailer in Sunbury, Ohio and requested transportation of the trailer to Australia. On June 25, 2010, Gearhouse paid the remaining balance to Gerling. Upon its arrival in Australia, Gearhouse sent the trailer to Sony for the installation of electronic equipment. Sony sent the trailer to Varley for the modifications Humphrey recommended. Then it installed the television production equipment. Gearhouse has used the trailer ever since. Gearhouse did not attempt to reject the trailer until September 25, 2010.

Gerling also argues that Gearhouse should be precluded from offering evidence or argument that it breached the agreement by delivering the trailer overwidth and with undersized air conditioners because a buyer's failure to state a particular defect

which is ascertainable by reasonable inspection precludes the buyer from relying on the unstated defect to justify rejection or to establish a breach where the seller could have cured if stated seasonably. Gerling maintains that the issues of nonconformity now alleged by Gearhouse were not particularized by Gearhouse during the two-week inspection and the punch list prepared by Gearhouse's representative.

Gearhouse argues that it never signed the final acceptance and that it did not accept the non-conforming trailer. Gearhouse maintains that it did not have a reasonable opportunity to inspect the trailer because it was not completed at the time it was presented for inspection. During his deposition, Fisher testified that because the trailer was incomplete, he could not perform a complete and final inspection. He also testified that the air conditioners were covered at the time he inspected the trailer. External plates containing the model number and basic information about the air conditioning units had been removed. Fisher measured the width of the trailer "across the back. It was not in excess of two and a half meters." (*Id.*) He did not measure the trailer at any other point, because to make precise measurements "requires a lot of people, a lot of time, and some very, very careful measurements." (*Id.*, 18-19.) Although he had planned to leave Sunbury on June 25, Fisher extended his visit to June 28, 2010 "because of the delivery date slipping." (*Id.*, 34-35.)

Upon receipt of the trailer in Australia, Gearhouse says it immediately notified Gerling of its defects, including its overwidth and the underpowered air conditioner units. Gearhouse maintains that there is no basis for finding that it failed to particular-

17

ize a defect after a reasonable inspection. Even if Gearhouse accepted the trailer, it argues that the UCC provides for revocation of such acceptance and rejection of the trailer. Immediately after receiving the trailer, Gearhouse notified Gerling that the trailer had been declared overwidth and could not be registered or used for its intended purpose.

Decision. Acceptance or rejection of a good is controlled by section 1302.60 of the Ohio Revised Code, which states:

> [I]f the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may:
> (A) reject the whole; or
> (B) accept the whole . . . .

Ohio Rev. Code § 1302.60. Under § 1302.61 "[r]ejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." Under section 1302.01 of the Ohio Revised Code, delivery of goods does not in and of itself constitute acceptance. "'[A]cceptance' is a term of art which must be distinguished from a variety of other acts which the buyer might commit." WHITE & SUMMERS, HANDBOOK OF THE LAW UNDER THE COMMERCIAL CODE (6th Ed. 2012) § 9-2. Acceptance does not occur unless the buyer is provided with a reasonable time to inspect the goods and accepts them despite any nonconformity. However, a buyer accepts good when he fails to effectuate a seasonable rejection of the goods for their nonconformance under sections 1302.60(A) and 1302.61(A) of the Ohio

Revised Code or he does any act which is inconsistent with the seller's ownership. Ohio Rev. Code § 1302.64.

Although Gearhouse maintains that it rejected the trailer, the uncontroverted evidence demonstrates that Gearhouse kept it, had it repaired, installed television production equipment in the trailer, and used it in the course of its business. There is no evidence that Gearhouse rejected the trailer or seasonably notified Gerling of its rejection. Instead, communications between Gearhouse and Gerling suggest that Gearhouse sought to have Gerling address the alleged defects. When Gearhouse concluded that no satisfactory response would be forthcoming from Gerling, it proceeded to have the repairs completed by Varley. There is no evidence that Gearhouse communicated its intent to reject the trailer.

Although courts have held that initial attempts to address defects do not preclude a finding that goods were not accepted after efforts to cure defects failed, this is not the situation presented by this case. Gearhouse acknowledges that at some point it accepted the trailer, but it does not point to any point prior to its acceptance that demonstrates it notified Gerling of its rejection. Rather, the evidence demonstrates that despite its dissatisfaction, Gearhouse acted in a manner demonstrating acceptance of the trailer rather than rejection. Gearhouse went forward with its plans to have the equipment installed by Sony and permitted Sony to contract with Varley to have the modifications made. No evidence demonstrates that Gearhouse informed Gerling that it was revoking its acceptance or that the trailer was available for Gerling to pick up.

19

Moreover, Gerling objected to Gearhouse using Varley to make the modifications. Permitting Varley to make the modifications over the opposition of Gerling, installing the television production equipment, and suing the trailer for television productions are all "act[s] which [are] inconsistent with the seller's ownership." Ohio Revised Code § 1302.64(A)(3). *See, Ohio Diffuser & Ventilation Supply Co. v. Burks & Needles Co.*, 1980 WL 351950, *5 (Ohio Third District Ct. App. May 6, 1980).

Because there is no evidence from which a trier of fact could conclude that Gearhouse rejected the trailer, Gerling's motion *in limine* to preclude evidence or argument that Gearhouse rejected the trailer (doc. 107) is GRANTED. At the final pretrial conference, counsel for Gerling indicated that the its arguments concerning whether Gerling breached the agreement on grounds not specifically identified was an alternative argument in the event that the court ruled that Gearhouse would be permitted to introduce evidence that it rejected the trailer. As a result, this argument is MOOT.

s/Mark R. Abel<br>
United States Magistrate Judge